# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DARNELL COOPER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 12-cv-5625 |
| v. ) | |
| ) | |
| KARYN MORGAN *et al.*, ) | |
| ) | Judge Edmond E. Chang |
| Defendants. ) | Magistrate Judge Young B. Kim |
| ) | |
| ) | |
| ) | |
| ) | |

## PLAINTIFF DARNELL COOPER'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF FACTS

Pursuant to Local Civil Rule 56.1(b)(3)(C), Plaintiff Darnell Cooper ("Plaintiff") submits this Statement of Facts in opposition the Motion for Summary Judgment by Defendants Karyn Morgan, Angelique Matuzas, Kent Ocupe, and Stacey Headlee (collectively, "Defendants").

**Defendants Refused to Provide Plaintiff with Adequate Medical Care**

1. On the evening of June 16, 2011, Plaintiff suffered a painful burn from the shower water in Cell House F at Stateville Correctional Center ("Stateville"). (Cooper Dep.[1] 29:19-21; 38:14-19; 138:10-18.) Plaintiff's cellmate, James McRoy was in the shower room with Plaintiff when Plaintiff suffered the burn. (Cooper Dep. 31:7-12.)

2. On the morning of June 17, 2011, Plaintiff noticed discharge from the burn on his shirt. (Cooper Dep. 40:13-20.) When he removed his shirt, Plaintiff saw that his skin was

---

[1] "Cooper Dep." refers to the transcript of the July 15, 2015 deposition of Plaintiff Darnell Cooper, located at Docket No. 169.

disfigured, discolored, and blistered. (Cooper Dep. 40:13-41:17.) He requested medical attention from Stateville correctional officers, but they refused to assist. (Cooper Dep. 41:24-43:12.)

3. On June 18, 2011, when Defendant Karyn Morgan ("Morgan") visited Plaintiff's cell, Plaintiff showed the burns to her, explained that he was in pain, and requested medical attention, pain medication, and to see a doctor. (Exhibit 1[2] ¶ 1; Cooper Dep. 47:20-22.) Morgan did not provide Plaintiff with any medical care in response to his request. (Exhibit 1 ¶ 1.)

4. On June 20, 2011, Plaintiff was taken to the emergency room, where he told Defendant Angelique Matuzas ("Matuzas") that he had been burned by the F-house shower water on June 16, 2011, and had been in pain ever since. (Cooper Dep. 50:13-51:10.) Plaintiff requested that Matuzas provide him with pain medication and arrange for him to see the doctor. (Cooper Dep. 51:1-10.) Matuzas refused, and told Plaintiff that the doctor was not in. (Cooper Dep. 51:1-10.)

5. The same day, Plaintiff filed an emergency grievance to then-Warden Marcus Hardy explaining how he was burned, the severe pain he was experiencing as a result of those burns, and the lack of adequate medical care that he had received for those burns. (Exhibit 2; Cooper Dep. 53:14-24.)

---

[2] Exhibit 1 is a declaration executed by Plaintiff Darnell Cooper on October 30, 2015. Before signing the declaration, Plaintiff made minor corrections by striking through certain words and replacing them with words that he highlighted in yellow. Upon learning of these corrections, Plaintiff's counsel incorporated them into, and mailed to Plaintiff, a revised declaration. Plaintiff signed the revised declaration and placed it in IDOC mail on November 3, 2015 but due to delays affecting outbound mail at Stateville, Plaintiff's counsel has not yet received the clean declaration.

6. When Plaintiff saw Matuzas the next day, June 21, 2011, he again told her that he was in pain, again asked her for pain medication, and again requested that she allow him to see a doctor for his burns. (Cooper Dep. 56:6-22.) Matuzas refused Plaintiff's requests and told a security officer that Plaintiff was "making trouble." (Cooper Dep. 56:6-57:14.) The officer then escorted Plaintiff back to his cell. (Cooper Dep. 56:6-22.)

7. On June 22, 2011, Plaintiff requested, among other things, that Defendant Stacey Headlee ("Headlee") provide him with pain medication and allow him to see a doctor. (Cooper Dep. 59:14-60:5; Exhibit 1 ¶ 2.) Headlee refused both of these requests without explanation. (Cooper Dep. 59:21-60:5.)

8. On June 30, 2011, Plaintiff suffered burns on his head from the extremely hot shower water in F-House. (Cooper Dep. 62:5-12; 63:6-13.)

9. On July 1, 2011, Plaintiff noticed that the skin on his head was peeling from the burn he suffered on June 30, 2011. (Cooper Dep. 66:10-21.) When Defendant Karyn Morgan ("Morgan") visited his cell on July 1, 2011, Plaintiff informed Morgan that he had been burned on his head by the shower water, and showed his burns to her. (Cooper Dep. 66:22-67:16.) Plaintiff asked Morgan for pain medication, to allow him to see a doctor, and to place him on the sick call to see a doctor. (Cooper Dep. 68:5-11.) In response, Morgan walked away without arranging for Plaintiff to see a doctor or providing him any medical attention, including pain medication. (Cooper Dep. 68:12-15.)

10. Also on July 1, 2011, Plaintiff asked a corrections officer to arrange for medical attention for Plaintiff's burns. (Cooper Dep. 69:2-16.) The corrections officer ignored his request. (Cooper Dep. 69:2-16.)

11. On July 1st or 2nd of 2011, when Defendant Kent Ocupe ("Ocupe") visited Plaintiff's cell, Plaintiff showed Ocupe the burns that he had suffered on his head. (Cooper Dep. 70:7-21.) Plaintiff requested that Ocupe allow him to see a doctor, provide him with medical attention or pain medication, and place him on sick call. (Cooper Dep. 70:7-21.) Ocupe ignored Plaintiff's requests, and simply walked away. (Cooper Dep. 70:7-21.)

**Defendants do not Recall Their Interactions with Plaintiff**

12. Matuzas does not remember Plaintiff, whether she ever spoke with Plaintiff, or whether Plaintiff ever said anything to her about pain he was experiencing as a result of burns. (Matuzas Dep.[3] 60:2-63:20; Exhibit 3 ¶¶ 9-10.)

13. Morgan does not recall any interactions that she had with Plaintiff, and does not recall Plaintiff's injuries. (Morgan Dep.[4] 63:21-65:15; 78:13-24; Exhibit 4 ¶¶ 10-11.)

14. Ocupe does not remember having any interactions with Plaintiff. (Ocupe Dep.[5] 74:24-77:8; 78:3-79:9; 84:5-85:4.) Ocupe does not remember whether he authored any medical records about Plaintiff and is not aware of any medical records regarding Plaintiff. (Ocupe Dep. 83:6-8; Exhibit 5 ¶¶ 8-9.)

15. Headlee recalls seeing Plaintiff for his burns. (Headlee Dep.[6] 95:15-21.) She recalls that his skin was discolored and "showed proof" that he had been burned. (Headlee Dep.

---

[3] "Matuzas Dep." refers to the transcript of the July 13, 2015 deposition of Defendant Angelique Matuzas, located at Docket No. 169-2.
[4] "Morgan Dep." refers to the transcript of the June 3, 2015 deposition of Defendant Karyn Morgan, located at Docket No 169-1.
[5] "Ocupe Dep." refers to the transcript of the July 12, 2015 deposition of Defendant Kent Ocupe, located at Docket No. 169-3.
[6] "Headlee Dep." refers to the transcript of the June 9, 2015 deposition of Defendant Stacey Headlee, located at Docket No. 169-4.

95:15-21; 97:15-18.) Headlee does not recall whether Plaintiff asked to see a doctor, and does not "believe" that he asked for pain medication. (Headlee Dep. 100:1-18.) Headlee has no independent recollection of whether Plaintiff ever spoke with her about pain that he suffered from burns. (Headlee Dep. 114:21-117:13; Exhibit 6 ¶ 10.)

### Wexford's Policies and Procedures for the Treatment of Burns

16. Wexford has adopted nursing treatment protocols formulated by the Illinois Department of Corrections. (Funk Dep.[7] 113:24-114:4; 115:21-116:17.)

17. During orientation, Wexford nurses were trained regarding the treatment protocols, were provided with a set of the treatment protocols to review, and were shown exactly where the treatment protocols were located at the facility. (Matuzas Dep. 31:13-20; *see also* Funk Dep. 47:15-48:17.) The nursing protocols were easily accessible to nurses, and were located less than a minute's walk from the urgent care facility. (Matuzas Dep. 20:20-21:8.)

18. The nursing protocol for burns that Wexford has adopted (the "Protocol") indicates that superficial burns and superficial partial thickness burns are painful. (Exhibit 7, pg. 4.) The Protocol also indicates that deep partial thickness burns are usually painful to pressure. (Exhibit 7, pg. 4.) The Protocol indicates that superficial partial thickness burns sometimes blister, and that deep partial thickness burns always blister and are usually wet. (Exhibit 7, pg. 4.)

19. Wexford nurses are required to take several steps when they encounter a patient complaining of burns. (Exhibit 7, pgs. 5-6.) First, Wexford nurses are required to ask the patient

---

[7] "Funk Dep." refers to the transcript of the June 4, 2015 30(b)(6) deposition of Wexford Health Sources through its designated representative Arthur Funk, M.D., located at Docket No. 169-5.

about and document the cause of the burn, the time that the burn happened, whether the patient has any chronic diseases, whether the patient is taking or is allergic to any medications, and whether the patient is otherwise immunocompromised. (Exhibit 7, pg. 5.) Next, Wexford are required to examine the patient and document the physical characteristics of the burn and the patient's vital signs. (Exhibit 7, pg. 5.)

20. Wexford nurses are required to refer any patient with any kind of burn to a physician, physician's assistant, or nurse practitioner. (Exhibit 7, pgs. 5-6.) If a patient has a burn that is more severe than a small superficial or minor burn, or if the patient has a complicating medical condition, Wexford nurses are required to immediately call the physician on duty. (Exhibit 7, pg. 5-6.) If a patient has only a small superficial or minor burn, Wexford nurses are required to schedule the patient to see a physician, physician's assistant, or nurse practitioner at the next available sick call. (Exhibit 7, pg. 5 §D.) Wexford nurses are required to call a doctor if a patient has blisters as a result of a burn. (Exhibit 7, pg. 6 §E(1)(b).) The practice in effect at Stateville during 2011 was that Wexford nurses call a physician any time they encounter any patient with any burn. (Matuzas Dep. 37:3-10; 38:2-8; 85:10-22.)

21. Wexford nurses are required to apply silver sulfadine to minor burns, and must provide pain medication to patients with any minor or superficial burn: either one to two 325 mg tabs of acetaminophen, three times a day for three days, or one 400 mg tab of ibuprofen, four times per day for three days. (Exhibit 7, pg. 6 §E(1).) Wexford nurses are required to reassess minor burns after two to four hours and if the patient is still in pain, they must call the doctor on call. (Exhibit 7, §E(1)(d).)

22. Wexford nurses are authorized and required by the treatment protocol to provide

pain medication to inmates for pain suffered as a result of burns. (Funk Dep. 152:5-19; 163:10-22.) Because the treatment protocol for burns calls for pain medication, Wexford nurses do not need to consult a doctor or another nurse before providing pain medication to an inmate with burns. (Funk Dep. 178:20-24.)

23. At least one doctor was physically present at Stateville on all weekdays and was available by telephone on the weekends. (Matuzas Dep. 39:14-23.)

24. If a nurse is passing out medication and encounters an inmate who complains of having suffered a burn, the nurse is supposed to perform an assessment of that patient. (Funk Dep. 169:8-21.) Under Wexford's policies, it would not be appropriate for a nurse to ignore an inmate who complained of suffering a burn and being in pain. (Funk Dep. 170:2-12.) It would be "totally inappropriate" for a Wexford nurse to ignore an inmate's request to be placed on sick call or see a doctor for pain medication. (Funk Dep. 197:13-198:3.)

**Defendants' Testimony Regarding Arranging for Inmates to See Doctors**

25. Headlee testified that while working for Wexford, if she thought a patient needed to see a doctor, she would put them on the sick call list to see a doctor. (Headlee Dep. 76:14-17.) Matuzas testified that Wexford nurses can decide on their own whether to place a patient on sick call to see the doctor, and can place a patient on sick call on their own. (Matuzas Dep. 29:13-15; 55:24-56:2.) Morgan testified that the only ways for an inmate to be placed on sick call is to put a note in the box in their house or to orally notify a guard, but later acknowledged that she could decide whether to put a patient on sick call and had filled out sick call requests forms for patients. (Morgan Dep. 32:2-33:1; 47:8-10.) Ocupe testified that he had discretion to decide whether an inmate should be placed on sick call. (Ocupe Dep. 54:21-55:1.)

**Testimony Regarding Providing Pain Medication**

26. On at least two occasions, without consulting a doctor, Wexford nurses at Stateville have provided Plaintiff with pain medication for which he had no prescription. (Exhibit 1 ¶¶ 3-4.)

27. Matuzas testified that Wexford nursing treatment protocols allowed her to provide treatment and pain medication (up to 400 mg of ibuprofen) without a doctor's order. (Matuzas Dep. 20:2-19; 21:24-22:19.) Wexford nurses did not need to contact a doctor before providing the treatment specified in the protocol. (Matuzas Dep. 26:19-21.)

28. Morgan testified that she could provide medication if there was a doctor's order or a protocol that states the medication can be given. (Morgan Dep. 20:23-21:6.)

29. Ocupe testified that if an inmate complained of pain, it was his job to give them pain medication. (Ocupe Dep. 55:6-14.) He further testified that "any nurse can give out pain medication. It's not really up to you to believe whether they're in pain or not. If they're saying they're in pain, you have to do something about it." (Ocupe Dep. 55:15-20.)

**Testimony Regarding Whether Nurses Could Assess Patients While on a Medication Pass**

30. Ocupe testified that if a patient complained to him about a medical issue while he was passing medication, he would conduct an assessment and, if he felt it was appropriate, put a patient on sick call to see the doctor. (Ocupe Dep. 37:6-38:4; 59:18-60:2.)

31. Headlee testified that one of her job duties was to conduct screenings of patients

with medical conditions while she was passing medications and, if she felt that the medical issue needed additional attention, to let a correctional officer know that he needed to be taken out of the cell for treatment. (Headlee Dep. 34:14-35:15.)

**Plaintiff's Grievances**

32. Plaintiff submitted a medical treatment grievance on June 20, 2011 in which he complained about the lack of medical treatment that he had received for a burn that he suffered on June 16, 2011. (Exhibit 2.) In that grievance, Plaintiff described Morgan in detail, as "light skinned" woman with "big brown eyes" and "blond hair," who was wearing "a 2-piece green nurses outfit." (Exhibit 2.) He requested that the F House shower temperature be adjusted and that the individuals who denied him medical treatment be suspended and pay to him monetary damages. (Exhibit 2.)

33. On July 5, 2011, Plaintiff filed a medical treatment grievance in which he complained about the lack of medical treatment that he had received for the burns that he suffered on June 16, 2011 and June 30, 2011. (Exhibit 8.) In that grievance, Plaintiff complained that despite several encounters with medical personnel, he had still not received any pain medication for his burns. (Exhibit 8.) Plaintiff incorporated his June 20, 2011 grievance into the July 5, 2011 grievance. (Exhibit 8.)

34. Plaintiff submitted a medical treatment grievance on September 1, 2011, in which he complained about the lack of medical treatment that he received for the burns he suffered on June 16, 2011 and June 30, 2011. (Exhibit 9.) In that grievance, Plaintiff specified each of the dates on which he requested, and did not receive, medical attention from the Defendants, and stressed that he had not been provided with any pain medication. (Exhibit 9.) Plaintiff

incorporated the grievances that he filed on June 30, 2011 and July 20, 2011. (Exhibit 9.)

35. On December 2, 2011, Illinois Department of Corrections employee Cynthia Garcia authored a memorandum to the Grievance Office which stated that she had reviewed Plaintiff's medical file, listed some of the dates that Plaintiff had been seen by medical personnel, and noted that Plaintiff was "healing well." (Exhibit 10.)

36. On December 27, 2011, Grievance Officer Anna McBee ("McBee") reviewed and provided a recommendation regarding Plaintiff's grievances regarding the lack of adequate medical treatment that Defendants provided to him. (Exhibit 11.) The "nature of the grievance" listed on the report was "Medical Treatment" (typed) and "Conditions Water to Hot in Unit F" [sic] (handwritten). (Exhibit 11.) McBee reviewed Plaintiff's medical file, and provided the following recommendation: "Issue appears to be resolved as grievant appears to be receiving appropriate medical care at this time." (Exhibit 11.) McBee also noted that "Maint will adjust water temp." (Exhibit 11.) On January 3, 2012, then-Warden and Chief Administrative Officer Marcus Hardy concurred with McBee's recommendation. (Exhibit 11.) On January 18, 2012, Plaintiff signed the portion of the report indicating that he was appealing the Chief Administrative Officer's decision to the Director. (Exhibit 11.)

37. Plaintiff appealed the Chief Administrative Officer's decision. (Cooper Dep. 92:9-19.) On June 1, 2012, The Illinois Department of Corrections Administrative Review Board and Director (together, the "Board") responded to Plaintiff's appeal about the response to his grievances regarding the lack of adequate medical treatment that Defendants provided to him. (Exhibit 12.) In the June 1, 2012 response, the Board indicated that it had reviewed "all available information" and concluded that Plaintiff's "medical needs are being addressed by the

-10-

Stateville Correctional Center Administration, in accordance with established policies and procedures." (Exhibit 12.)

38. In 2011, when Plaintiff filed the June 20th, July 5th, and September 1st grievances, he did not know the Defendants' names. (Cooper Dep. 140:10-12.)

Dated: November 10, 2015                           Respectfully submitted,

                                                    /s/ Alex J. Maturi

                                                    Jon A. Geier
                                                    Christopher F. Allen
                                                    Alex Maturi
                                                    Paul Hastings LLP
                                                    71 South Wacker Dr.
                                                    45th Floor
                                                    Chicago, IL  60606
                                                    Telephone:  (312) 499-6000
                                                    Facsimile:   (312) 499-6100
                                                    Email: alexmaturi@paulhastings.com
                                                    *Counsel for Plaintiff Darnell Cooper*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of November, 2015, I served true and correct copies of **Plaintiff Darnell Cooper's Local Rule 56.1(b)(3)(C) Statement of Facts** via Electronic Mail, upon the following counsel of record for Defendants:

Peter James Strauss
Cunningham, Meyer & Vedrine
One East Wacker Drive
Suite 2200
Chicago, IL 60601
(312) 578-0319
pstrauss@cmvlaw.com

    /s/ Alex J. Maturi
Alex J. Maturi
*Attorney for Plaintiff Darnell Cooper*